EQUITABLE LIFE ASSUR. SOC. OF UNITED STATES *et al. v.* MITCHELL.

(In Banc. Jan. 27, 1947. Suggestion of Error Overruled March 17, 1947.)

[29 So. (2d) 88. No. 36277.]

Livingston & Fair, of Louisville, **Wells, Wells, Newman & Thomas**, of Jackson, and **Louis W. Dawson**, of New York City, for appellant, Mutual Life Ins. Co. of New York.

698

700

Watkins & Eager, of Jackson, Livingston & Fair, of Louisville, and Leo D. Fitzgerald, of New York City, for appellant, Equitable Life Assurance Society of the United States.

Rodgers & Priscock, of Louisville, for appellee.

704

Barnett, Barnett, **Jones** & **Stone**, of Jackson, for appellee.

706

708

Argued orally by **Earl Thomas** and **Tom Watkins**, for appellants, and by **Henry L. Rodgers** and **Ross R. Barnett**, for appellee.

**Roberts, J.,** delivered the opinion of the court.

Robert L. Mitchell, Jr., had a life insurance policy with the Mutual Life Insurance Company of New York in the sum of $2,500 and one with the Equitable Life Assurance Society of the United States in the sum of $2,000, both policies imposing double indemnity in case of death by accident.

Mitchell lost his life in an automobile accident June 23, 1944. The Insurance Companies paid to Mrs. Jessie P. Mitchell, the beneficiary in both policies, the above stated amounts but refused to pay the double indemnity.

On September 20, 1944, Mrs. Mitchell filed separate suits against said Companies to collect the double indemnity. The two cases were tried together by agreement.

Both defendants filed pleas of general issue and gave notice of special defenses. In the Mutual Company case the special notice alleged the Insurer was not liable because the accident was the result of an assault by Mitchell upon Mrs. Marcella Bouchillon, the driver of the automobile, the policy containing a provision the Insurer would not be liable for the double indemnity if the accident should result from the commission of "an assault or felony" by the Insured. The Equitable policy provides the Company is not liable if death should be the result of " . . . the Insured's violation of any law."

The Company gave notice it would prove that Mitchell's death was the result of his violation of the law in that (1) he was driving an automobile upon the public highway while in an intoxicated condition, (2) was drunk in a public place in the presence of two persons, (3) was transporting intoxicating liquor in an automobile along the public highway, and (4) that he committed an assault and battery upon Mrs. Bouchillon, the driver of the automobile, causing the accident. The plaintiff, in her replication, took issue upon these various defenses, and asserted further they would not relieve the Insurers of liability because (a) Mitchell, at the time of the alleged assault upon Mrs. Bouchillon, "was under the influence of intoxicating liquors and had no intention to violate the law"; (b) that the cause of the accident was not the violation of law by Mitchell but was the result of a flat tire on the automobile.

From verdicts and judgments against them the defendants appeal.

The main contention below was and here is that they should have been granted peremptory instructions. This contention is based upon the further contention that the proof in this case shows without material contradiction that the accident was caused by Mitchell's striking Mrs. Bouchillon, the driver of the car, several blows in the face with his fist or hand, causing her to lose control of the automobile, resulting in the wreck in which Mitchell lost his life. Since we have concluded that position is well taken we will confine this opinion to that issue. It will be necessary for us to construct from the evidence a moving picture of the events bearing upon that question.

Robert L. Mitchell, Jr., the Insured, 44 years of age, and Miss Margaret Hill, 24 years of age, and Mrs. Marcella Bouchillon, 21 years of age (Mrs. Roberts at the time of the trial), all lived in Louisville, Mississippi. On the afternoon of June 23, 1944, Mitchell asked Mrs. Bouchillon to accompany him to Mayhew Junction in

Lowndes County, Mississippi, to purchase some beer. It appears Mrs. Bouchillon demurred unless some one else went along. Mitchell then invited Miss Hill to make the trip, these two ladies being well acquainted, having theretobefore worked together at the cafe where Miss Hill was then a waitress. Miss Hill agreed to go. About seven o'clock that evening these young ladies, according to previous arrangement, appeared in a taxicab at what is called Canal Bridge, about two miles east of Louisville, where Mitchell and one Noah Carrol were waiting in Mitchell's automobile. The ladies got into the Mitchell car, also transferring thereto a case of empty beer bottles they had brought along. The four drove towards Macon, which is about 32 miles east of Louisville. They stopped at the home of Carrol, some seven or eight miles from Louisville, where Mitchell procured a one-gallon jug of whiskey. Carrol went no farther and disappears from the case. The other three took a drink from the jug, placed the jug on the back seat and themselves on the front seat and proceeded towards Macon, Mrs. Bouchillon driving. Some seven miles before reaching Macon they stopped, pulled the cork from the jug and took another drink. At Macon they ate supper at the hotel, the hotel porter bringing the jug from the car, and they all took another drink. At about 9:30 they started on their journey to Mayhew Junction, which is some thirty miles north of Macon, Mrs. Bouchillon driving. At Mayhew Junction they were informed the beer had not arrived but was expected soon. The two young ladies ate sandwiches. Apparently they all took another drink from the jug, but that is not clear. It seems that Mitchell was not feeling very well and remained in the car. While there Mrs. Bouchillon engaged in conversation with two young men of her acquaintance. The young men were given drinks from the jug. After about an hour, the beer not having arrived, the three proceeded back towards Macon, Mrs. Bouchillon driving. When they had driven about two miles Mitchell became angry at Mrs.

Bouchillon for having talked with the two young men. He struck her several times in the face with his fist, causing her nose to bleed and her to cry. She could not drive with her nose bleeding, so Mitchell took the wheel. He did not succeed very well, and when they turned west at Macon towards Louisville Mrs. Bouchillon began to drive. They had not gone far when Mitchell's anger again came to the surface and he renewed his attacks upon Mrs. Bouchillon, hitting her in the face with his fist. Both ladies begged him to stop, which he did. Shortly thereafter Mitchell told them to join him in singing The Old Rugged Cross. They all sang. However, he soon recovered from his spiritual inspiration and once more began to strike and slap Mrs. Bouchillon in the face with his hand and fist. Since this is the crucial point of the case we will give the testimony of these young ladies verbatim. Miss Hill described the events in this wise:

"Q. Where did he hit her? A. On the side of the face.

"Q. How many times did he hit her? A. Several more times.

"Q. What did she say, if anything? A. Not anything.

"Q. How far was that from the place of the wreck? A. The last time he hit her the car swerved to the side of the road.

"Q. Which side of the road? A. The right hand side—no, it was on the left hand side coming this way.

"Q. Then what happened? A. I screamed and told her to watch where she was going.

"Q. All right, what happened then? A. She tried to straighten the car back up.

"Q. And what took place? A. She said—

"Q. (Interrupting) Not what she said. What did you see happen? A. Well, the car hit the bank and that's all I remember.

"Q. On which side? A. The right hand side.

"Q. It first swerved in what direction? A. To the left hand side.

"Q. And when it swerved to the left hand side of the road you said what? A. Watch where you are going.

"Q. Then which direction did the car go? A. The right hand side.

"Q. How fast was she driving at the time the car swerved? A. Not very fast.

"Q. When the car swerved to the right hand side of the road what happened to it? A. She tried to straighten it up.

"Q. Then what happened? It hit a bank on the right hand side of the road.

"Q. And what happened to the car? Where did the car go? A. It didn't go any farther.

"Q. What happened to it? A. Well, it just wrecked.

"Q. What do you mean by wrecked? A. Well, it hit the bank and stopped. I suppose it stopped.

"Q. It didn't go down the bank? A. It went down in the ditch and went on the shoulder of the road.

"Q. Then what happened to the car? A. Well, it stopped.

"Q. What was its condition when it stopped? A. I don't know."

Again, she said:

"A. It was on the right hand side of the road when it wrecked.

"Q. In what position with respect to the bank? Did it go down the bank? A. It was a high bank on the side of the road and a little ditch that ran along the side of the shoulder of the road and the car was leaning up against the bank there.

"Q. What did the car run across before it hit the bank? A. Well, there was a culvert in the road and the front of the car ran off that culvert. It was a little side road that cut out and went up and it was a culvert there in that little ditch that ran alongside the road, and the

front of the car ran off into that culvert into the bank—
into that ditch.

"Q. Did it go into the ditch? A. Yes, sir, on that little road."

Mrs. Bouchillon's account of the events is this:

"A. . . . for some reason he got mad and he hit me and everything went black and I started to the left of the road and I could hear Margaret calling and I straighten the car up and got it back in the middle of the road and was trying to see, and I says, 'Bob, please don't hit me any more, I will have to drive this car,' and he says, 'You will drive the damn thing anyway,' and he hit me again and everything went black.

"Q. You said he hit you and you went off the left side? A. Went to the left side, yes, sir.

"Q. How come you to go off the left side? A. Everything went black and I must have grabbed my face.

"Q. How soon was it after he hit you that you went off the left side? A. When I came to myself I was on the left side and I got it back in the middle of the road.

"Q. Well, what happened then? A. I asked him not to hit me again, that I would have to drive the car, and he told me I would drive the damn thing anyway and he hauled off with his hand and hit me across my eyes.

"Q. What part of his hand did he hit you with? A. His open hand.

"Q. And then where did you go? A. Everything went black and the next thing I knew we were—

"Q. You were what? A. Well, the car wrecked.

"Q. What caused the car to wreck? A. He hit me and I lost control of the car.

"Q. Tell the court whether or not if he hadn't struck you even the last time when you asked him not to if the car would have wrecked? A. No, sir, if he hadn't hit me the last time I could have drove in, but the last time he hit me so hard everything went black."

Diligent counsel for appellee undertook to weaken the effect of the testimony of Mrs. Bouchillon by attempting

to show she had made contradictory statements as to some details of this affair; that she was in love with Mitchell and that her general reputation for truth and veracity was not good. We deem it unnecessary to give the details of this evidence pro and con, or to comment upon its likely effect, for the reason that, if the testimony of Mrs. Bouchillon is entirely disregarded, that of Miss Hill is to the same effect and it stands unimpeached and uncontradicted in any material respect. They were the only two eye witnesses.

But appellee says that the proof shows that the cause of this accident was a flat tire on the right rear wheel of this car—at least, she says there was sufficient proof of this for the jury to so find. This, in fact, is the main question in the case. On that point appellee introduced four witnesses. W. R. Ward testified he was a mechanic and he went to the scene the morning after the accident; that the right rear wheel ". . . was knocked loose from the hub and was off''; that it was broken loose from the top of the hub. Floyd Parks testified he was in the automobile business and that he bought the wrecked car sometime after the accident; that the car had a flat tire in the trunk; that it was on the rim and the synthetic inner tube was split "up and down" about six or eight inches; that the bead of the casing was not broken; that the casing was "about half worn out," but he used it again, and that a flat tire would make a wider track on asphalt or "pavement" than one properly inflated, and the rim of the wheel would make dark marks on the concrete. When asked how the marks would be made he replied: "It depends on the tread on the tire. If it is a good tire and it has a good heavy tread it will zig-zag quite a bit. If not, it won't zig-zag so much." On cross-examination he admitted a car might hit a bank with sufficient force to "burst the tire." R. L. Reed testified that he went to the scene about three to three-thirty o'clock the next day after it happened. He said, ". . . I seen looked like where a casing skidded across the high-

way, black streaks"; that they were parallel lines. He was asked:

"Was there any difference in those two parallel lines or rubber marks on the highway? A. I don't know that there was, it was just a dark streak, sort of a double streak like.

"Q. Was there anything peculiar about either one of those tracks. A. Nothing only it looked as if one of those tracks—for instance, it looked like where a flat dragged to me. It didn't look like the break was on and it kind of —it was in a wobble like. It looked like the casing and the black streak was in a wobble"; that was just above the culvert "a little piece."

The main witness on this question was Dennis Cross. He was a highway patrolman and lived in Louisville. He reached the scene about four o'clock in the morning— some two hours after the accident. He said he busied himself directing traffic with his flashlight, ". . . there were cars going back and forth by the scene, and I was telling them where to park or else go ahead." After daylight he examined the car, "The car was an Oldsmobile, color green, and was sitting on its four wheels, or three wheels I'll say because the right rear wheel was torn off the car, or was missing, and I looked in the car and the car was all shambled up inside and the front door on the right hand side was open . . . the right front and right side of the automobile was more or less completely demolished, and so I noticed this wheel that was missing from the right rear laying over to the left, and I went over and checked that wheel and it looked like it had been torn loose from the hub of the wheel and this particular wheel was flat, . . ." that "around fifty yards back—I'll say one hundred fifty yards from where the car actually stopped east of the accident was the light print of a tire or skid or what not, I wouldn't know . . ."; that "it was coming down the right hand side of the road and gradually went off to the left and hit the shoulder" that there was about fifty yards of

tire imprint. Again he said, "Yes, sir, going down the shoulder you could still see the skid marks of the tire kicking up dirt, and it went down the shoulder for thirty-five or forty yards and cut back across the road at more or less a forty-five degree angle, and when it hit back on the pavement the tire marks were wide and the indications of the car was it was skidding as though a lot of weight was on it; it was skidding a good bit at that sharp angle, and it went forty-five feet from one edge of the concrete to the other one at that angle across the road until it went off on the right shoulder, and just before it hit the end of the culvert on the right shoulder it hit a bank, and from the edge of the pavement until it hit the bank the skid marks were heavily imprinted there." He was asked, "Was there any difference in the parallel marks as to the width of the tread?" He replied, "If I am not mistaken the right one was a good deal wider than the left one, the tread mark was." He was asked if there was anything peculiar about the right tread and he replied, "Well, it seemed like the left tread mark was more or less a straight line skidding and the right one was wider and sort of irregular." "Q. Was there anything peculiar about the edges of the mark on the right hand side? A. It made marks a little bit zig-zagged." He said there was a difference between a track made by a flat tire and one carrying the proper amount of air, and that of the two treads that "crossed the road," the left "was the narrower of the two treads"; that "it didn't look like the one on the right." "Q. What was the difference in the two treads? I mean what was the difference in the two tracks? A. It was just that little irregularity, that irregular imprint of the tire." He was asked if he could tell from tracks on "pavement . . . and in the dirt and on the ground where it is visible," whether the tire was "inflated or deflated." He answered, "On pavement I think I could." Finally he was asked if in his opinion the tire which made the track about which he had testified was made by "a de-

flated or flat tire." He replied, "In my opinion it was"; he thought it was the right tire. "Q. You mean by that it was a flat tire? A. Well, that would be my opinion of it." Above was given on direct examination. On cross-examination it appears that three of counsel for the Insurance Companies went to the scene of the wreck and there talked with Mr. Cross and he never mentioned to them about these alleged tracks or marks on the asphalt. He was asked, "You are not on the stand attempting to tell the jury that Mr. Mitchell striking Mrs. Bouchillon was not the cause of the accident. A. I don't know. Q. You don't know what was the cause of the accident, do you? A. No, sir. Q. And you are not pretending to tell the jury? A. No, sir." It was further shown on cross-examination that Cross, as was his duty, made a written report to the Highway Commission as to any defect in the Mitchell automobile which might have contributed to the wreck. He reported there was no such defect in the car, expressly mentioning the tires.

On the other hand, Miss Hill and Mrs. Bouchillon testified positively the tire was not flat or going down. Mrs. Bouchillon said she had driven the car many times; that she knew how a car felt when being driven as a tire was going flat. Both again and again said the cause of the wreck was the striking of Mrs. Bouchillon by Mitchell.

Thus, to present fully and fairly the contention of appellee, we have given at length, and, we fear, in tiresome detail, the substance of the testimony on the point under consideration.

It is evident, in the first place, that much of it was incompetent, consisting of opinions and conclusions of the witnesses. No witness was shown to be an expert on the subject, if, indeed, the nature of the subject permits of expert testimony. It is common knowledge and ordinary observation that a flat tire will make a broader imprint, if it makes any at all, than one properly inflated.

In the second place, a reading of the quoted evidence and of that in the record not quoted, demonstrates that,

to a very large extent, it was guess-work and speculation pure and simple, vague and indefinite, both as to the nature of the facts and the effect thereof. There is no reliable proof the Mitchell car made the marks, such as they were. It is evident that many vehicles of various kinds had traveled that road after the accident and before Cross arrived some two hours later and many others passed thereafter before he examined the road. He said he was so busy directing traffic he made no examination of the road until after daylight came. There is no dispute the right rear wheel of the Mitchell car was broken loose from the hub. It is clear, too, that was done by the force of the car either striking the culvert or the embankment. If that wheel had been off while the car was travelling the public road, this hub would certainly have made distinct marks and cuts upon the asphalt or black-top. These would not have looked like they were made by a low-pressure or flat tire. At most this evidence could only amount to a conjecture or possibility. "Courts in civil cases act upon reasonable probabilities. In trials under the common law, to prove a possibility only, or to leave the issue to surmise or conjecture, is never sufficient to sustain verdict." Columbus & Greenville Railway Co. v. Coleman, 172 Miss. 514, 160 So. 277, 279. Again, "The verdict of the jury cannot be allowed to stand upon a scintilla of evidence or upon a mere possibility. In such situation, it was the duty of the Court to have granted the peremptory instruction. The scintilla rule of evidence is not recognized in this state." Mutual Benefit Health & Accident Ass'n v. Johnson (Miss.), 186 So. 297, 298. Under the circumstances here the jury could not guess with any more certainty and accuracy than could the witnesses. The peremptory instructions should have been given:

Reversed and judgments here for appellants.

**Sydney Smith, C. J.,** did not participate in this decision.